1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DENNIS D. MITCHELL, | ) | 1:06-cv-1808-SMS |
| | ) | |
| Plaintiff, | ) | DECISION AND ORDER DENYING |
| | ) | PLAINTIFF'S SOCIAL SECURITY |
| v. | ) | COMPLAINT (DOC. 1) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | ORDER DIRECTING THE ENTRY OF |
| Security, | ) | JUDGMENT FOR DEFENDANT MICHAEL J. |
| | ) | ASTRUE, COMMISSIONER OF SOCIAL |
| Defendant. | ) | SECURITY, AND AGAINST PLAINTIFF |
| | ) | DENNIS D. MITCHELL |
| | ) | |

17    Plaintiff is represented by counsel and is proceeding in

18 forma pauperis with an action seeking judicial review of a final

19 decision of the Commissioner of Social Security (Commissioner)

20 denying Plaintiff's application for disability insurance benefits

21 (DIB) under Title II of the Social Security Act (Act). Pursuant

22 to 28 U.S.C. § 636(c)(1), the parties have consented to the

23 jurisdiction of the Magistrate Judge to conduct all proceedings

24 in this matter, including ordering the entry of final judgment.[1]

25 The matter is currently before the Court on the parties' briefs,

26 which have been submitted without oral argument to the Honorable

27 —————————————

28    [1]On February 13, 2007, the Honorable Oliver W. Wanger ordered the case reassigned to the undersigned
Magistrate Judge for all further proceedings.

1

Sandra M. Snyder, United States Magistrate Judge.

II. <u>Procedural History</u>

    With a protective filing date of February 13, 2004, Plaintiff applied for Disability Insurance Benefits (DIB) on April 7, 2004, alleging disability since November 26, 1997, due to back and neck injury, spasms, migraine headaches, constant pain, injury to knees and feet, depression, anxiety, difficulty being around others, hypertension, diabetes, and nerve damage to the right arm. (A.R. 70-73, 95.) After Plaintiff's claim was denied initially and on reconsideration, Plaintiff requested, and appeared at, a hearing before the Honorable Michael J. Haubner, Administrative Law Judge (ALJ) of the Social Security Administration (SSA), on December 1, 2005. (A.R. 35-49, 14.) Plaintiff testified and was represented by counsel. (A.R. 596-631.) On February 9, 2006, the ALJ denied Plaintiff's application for benefits. (<u>Id.</u> at 14-22.) Plaintiff appealed the ALJ's decision to the Appeals Council. After the Appeals Council denied Plaintiff's request for review on October 24, 2006, Plaintiff filed the complaint in this action on December 12, 2006. (<u>Id.</u> at 5-7.) Briefing by both parties commenced on July 3, 2007, and was completed on August 15, 2007, with the filing of Plaintiff's reply brief.

II. <u>Standard and Scope of Review</u>

    Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g).

1  Substantial evidence means "more than a mere scintilla,"

2  Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a

3  preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10

4  (9th Cir. 1975). It is "such relevant evidence as a reasonable

5  mind might accept as adequate to support a conclusion."

6  Richardson, 402 U.S. at 401. The Court must consider the record

7  as a whole, weighing both the evidence that supports and the

8  evidence that detracts from the Commissioner's conclusion; it may

9  not simply isolate a portion of evidence that supports the

10 decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.

11 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  It

12 is immaterial that the evidence would support a finding contrary

13 to that reached by the Commissioner; the determination of the

14 Commissioner as to a factual matter will stand if supported by

15 substantial evidence because it is the Commissioner's job, and

16 not the Court's, to resolve conflicts in the evidence. Sorenson

17 v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

18     In weighing the evidence and making findings, the

19 Commissioner must apply the proper legal standards. Burkhart v.

20 Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must

21 review the whole record and uphold the Commissioner's

22 determination that the claimant is not disabled if the

23 Commissioner applied the proper legal standards, and if the

24 Commissioner's findings are supported by substantial evidence.

25 See, Sanchez v. Secretary of Health and Human Services, 812 F.2d

26 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If

27 the Court concludes that the ALJ did not use the proper legal

28 standard, the matter will be remanded to permit application of

1  the appropriate standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th

2  Cir. 1987).

3     III. <u>Disability</u>

4     In order to qualify for benefits, a claimant must establish

5  that she is unable to engage in substantial gainful activity due

6  to a medically determinable physical or mental impairment which

7  has lasted or can be expected to last for a continuous period of

8  not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).

9  A claimant must demonstrate a physical or mental impairment of

10 such severity that the claimant is not only unable to do the

11 claimant's previous work, but cannot, considering age, education,

12 and work experience, engage in any other kind of substantial

13 gainful work which exists in the national economy. 42 U.S.C.

14 1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th

15 Cir. 1989). The burden of establishing a disability is initially

16 on the claimant, who must prove that the claimant is unable to

17 return to his or her former type of work; the burden then shifts

18 to the Commissioner to identify other jobs that the claimant is

19 capable of performing considering the claimant's residual

20 functional capacity, as well as her age, education and last

21 fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d

22 1273, 1275 (9th Cir. 1990).

23    The regulations provide that the ALJ must make specific

24 sequential determinations in the process of evaluating a

25 disability: 1) whether the applicant engaged in substantial

26 gainful activity since the alleged date of the onset of the

27 impairment, 20 C.F.R. § 404.1520; 2) whether solely on the basis

28 of the medical evidence the claimed impairment is severe, that

1  is, of a magnitude sufficient to limit significantly the

2  individual's physical or mental ability to do basic work

3  activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the

4  basis of medical evidence the impairment equals or exceeds in

5  severity certain impairments described in Appendix I of the

6  regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant

7  has sufficient residual functional capacity, defined as what an

8  individual can still do despite limitations, to perform the

9  applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and

10 5) whether on the basis of the applicant's age, education, work

11 experience, and residual functional capacity, the applicant can

12 perform any other gainful and substantial work within the

13 economy, 20 C.F.R. § 404.1520(f).[2]

14      Here, the ALJ concluded, with Plaintiff's counsel's

15 agreement, that Plaintiff was insured for purposes of DIB until

16 March 31, 2003; thus, the period in consideration was between

17 November 26, 1997, through March 31, 2003. (A.R. 605, 21.)

18      The ALJ found that Plaintiff, who was forty-eight years old

19 at the time of the decision and had a high school education and

20 additional vocational training, had severe impairments of status

21 post-cervical diskectomy and fusion of C6-7 vertebrae, C5 root

22 lesion, headaches, thoracic and lumbar pain, history of

23 depression, and a pain disorder that did not meet or medically

24 equal an listed impairment; Plaintiff had the RFC to lift twenty

25 pounds occasionally and ten pounds frequently and sit, stand, or

26 walk for six hours in an eight-hour day; Plaintiff had a limited

27

28      [2] All references to the Code of Federal Regulations are to the 2006 version unless otherwise stated.

5

1 ability for overhead work and moderate limitations of his ability

2 to understand, remember, and carry out detailed instructions and

3 to interact appropriately with the general public. (A.R. 21-22.)

4 Although Plaintiff could not perform his past relevant work, he

5 could perform a significant range of light work; using Medical-

6 Vocational Rule 202.21 as a framework for decision-making, there

7 were a significant number of unskilled jobs at the level of light

8 exertion that Plaintiff could perform, including dishwasher,

9 laundry worker, and assembly worker. Hence, Plaintiff was not

10 disabled through the date of decision.

11     IV. <u>Rejection of Plaintiff's Subjective Complaints</u>

12     Plaintiff argues that the ALJ's reasons for rejecting

13 Plaintiff's subjective complaints were legally insufficient

14 because the medical evidence of record reflected neck surgery,

15 treatment by many doctors of his pain, and a prescription for a

16 TENS unit. Plaintiff asserts that Plaintiff's persistent efforts

17 to obtain relief from pain were consistent with Plaintiff's

18 allegations of intense and persistent symptoms.

19     The court in <u>Orn v. Astrue</u>, 495 F.3d 625, 635 (9th Cir.

20 2007), summarized the pertinent standards for evaluating the

21 sufficiency of an ALJ's reasoning in rejecting a claimant's

22 subjective complaints:

23     An ALJ is not "required to believe every
allegation of disabling pain" or other non-exertional

24 impairment. See <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th
Cir.1989). However, to discredit a claimant's testimony

25 when a medical impairment has been established, the ALJ
must provide " 'specific, cogent reasons for the

26 disbelief.' " <u>Morgan</u>, 169 F.3d at 599 (quoting <u>Lester</u>,
81 F.3d at 834). The ALJ must "cit[e] the reasons why

27 the [claimant's] testimony is unpersuasive." <u>Id.</u> Where,
as here, the ALJ did not find "affirmative evidence"

28 that the claimant was a malingerer, those "reasons for

rejecting the claimant's testimony must be clear and convincing." Id.

Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. See S.S.R. 02-1p (Cum. Ed.2002), available at Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R. 96-7p (Cum. Ed.1996), available at 61 Fed.Reg. 34,483-01 (July 2, 1996). An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. See 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); see Daniels v. Apfel, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Fair, 885 F.2d at 603; see also Thomas, 278 F.3d at 958-59.

The factors to be considered in weighing credibility are set forth at length in the regulations and pertinent Social Security rulings. They include the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the person receives or has received for relief of the symptoms; any measures other than treatment the claimant uses or has used to relieve the symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529; S.S.R. 96-7p.

1    With respect to the course of analysis directed by the

2 regulations, the ALJ is first obligated to consider all symptoms

3 and the extent to which the symptoms can reasonably be accepted

4 as consistent with the objective medical evidence and other

5 evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). Once it is

6 determined that there is a medically determinable impairment that

7 could reasonably be expected to produce the claimant's symptoms,

8 the ALJ must then evaluate the intensity and persistence of the

9 symptoms to determine how the symptoms limit the capacity for

10 work. §§ 404.1529(b), (c); 416.929(b), (c). The ALJ will consider

11 all available evidence. To the extent that the claimant's

12 symptoms can be reasonably accepted as consistent with the

13 objective medical evidence and other evidence, the symptoms will

14 be determined to diminish the claimant's capacity for basic work

15 activities. §§ 404.1529(c)(4); 416.929(c)(4). A claimant's

16 statements will not be rejected solely because unsubstantiated by

17 the available objective medical evidence. §§ 404.1529(c)(2);

18 416.929(c)(2).

19    Further, the pertinent Social Security Ruling provides in

20 pertinent part that an ALJ has an obligation to articulate the

21 reasons supporting the analysis:

22    ...When evaluating the credibility of an individual's
      statements, the adjudicator must consider the entire
23    case record and give specific reasons for the weight
      given to the individual's statements.

24
      The finding on the credibility of the individual's
25    statements cannot be based on an intangible or
      intuitive notion about an individual's credibility. The
26    reasons for the credibility finding must be grounded in
      the evidence and articulated in the determination or
27    decision. It is not sufficient to make a conclusory
      statement that "the individual's allegations have been
28    considered" or that "the allegations are (or are not)

8

credible." It is also not enough for the adjudicator
simply to recite the factors that are described in the
regulations for evaluating symptoms. The determination
or decision must contain specific reasons for the
finding on credibility, supported by the evidence in
the case record, and must be sufficiently specific to
make clear to the individual and to any subsequent
reviewers the weight the adjudicator gave to the
individual's statements and the reasons for that
weight. This documentation is necessary in order to
give the individual a full and fair review of his or
her claim, and in order to ensure a well-reasoned
determination or decision.

S.S.R. 96-7p at 4.

Here, the ALJ expressly stated that he had considered
Plaintiff's subjective complaints, but he concluded that they
were not supported by the medical evidence before March 31, 2003,
and were not entirely credible when evaluated under Soc. Sec.
Ruling 96-7p. (A.R. 19.)

The ALJ reviewed accurately and with specificity the
substance of Plaintiff's testimony, noting that he testified that
before March 31, 2003, he was able to lift about ten pounds, walk
a block, stand for thirty minutes and sit for forty-five minutes;
maintain concentration for an hour, and get along with others;
because of migraine headaches that he had suffered for six or
seven years by the time of hearing, he lay down to rest for an
hour and one-half twice daily; he cooked twice a week, prepared
one simple meal daily, did the dishes daily, did laundry once a
week, and cleaned the kitchen and bathroom and vacuumed once a
month; he shopped twice a week, ate outside the home twice
weekly, drove twice weekly, and his car had a stick shift; he was
able to balance his checkbook; and he also had foot pain. (A.R.
19, 607-15.) Plaintiff testified that he was compliant with
treatment, but he also admitted that he smoked one and one-half

9

1 packs of cigarettes a day and drank a liter of diet Pepsi daily,
2 against medical directions. (A.R. 19, 615-16.)

3       The ALJ stated that weighing. (A.R. 19.)

4       In concluding that after weighing all the relevant factors,
5 Plaintiff's impairments were not as limiting as alleged before
6 March 31, 2003, the ALJ focused on the medical evidence of
7 record.

8       The ALJ noted that the treatment record through March 2003
9 did not show that Plaintiff had severe daily migraine headaches.
10 (A.R. 19.) The record supports the ALJ's conclusion because the
11 record reflects that throughout the pertinent period, Plaintiff
12 mentioned his headaches infrequently to physical therapists and
13 only once to a physician; his complaints were often resolving or
14 were relieved by medication and rest, or were ameliorated with a
15 sincere effort at physical therapy. (A.R. 274 [Plaintiff reported
16 to a physical therapist in January 1998 that he was taking
17 Ibuprofen for periodic headaches with nausea and vomiting, which
18 he felt were increasing]; A.R. 233 [in November 1998, Plaintiff
19 reported an increase in headaches to his physical therapist when
20 he went out of town to handle his mother's funeral, but treatment
21 to the upper thoracic area helped resolve the headaches, and
22 complaints had been much less]; A.R. 234 [Plaintiff reported to a
23 physical therapist in November 1998 that his headache complaints
24 had diminished; the therapist reported that Plaintiff was being
25 more conscientious during the ongoing therapy than in the past
26 and was progressing];  A.R. 226-27 [Plaintiff reported to pain
27 management consultant Dr. David R. Cooper in December 1998 that
28 he had headaches that started before his injury but were more

frequent since then, and they were relieved with Ibuprofen, reclining, and a special pillow]; A.R. 155 [Plaintiff reported to a physical therapist in December 2002 that he had headaches with vomiting that were relieved by lying down].) Any indication of headaches was noticeably missing from pain diagrams that Plaintiff completed. (A.R. 257 [orthopedic exam of June 1998], 226 [December 1998 exam by Dr. Cooper reflected a pain diagram that "specifically [showed] that his problem was between C5 and T6 or T7, radiating to both shoulders and to both upper arms"].)

It is established that although the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints of pain, Light v. Chater, 119 F.3d 789, 792 (9th Cir. 1997), it is one factor which may be considered with others, Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v. Commissioner 169 F.3d 595, 600 (9th Cir. 1999). Further, included in the factors that an ALJ may consider in weighing a claimant's credibility are the claimant's reputation for truthfulness; inconsistencies either in the claimant's testimony or between the claimant's testimony and the claimant's conduct, daily activities, or work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). The Court concludes that the ALJ's reasoning regarding Plaintiff's headaches was clear and convincing.

The ALJ also stated that before the May 2002 surgical diskectomy and fusion, the electrodiagnostic testing of Plaintiff's upper extremities showed no significant

abnormalities, while the April 2001 testing showed abnormality
only on the left, asymptomatic side. (A.R. 19.) Again,
substantial evidence supports this finding. Results of motor,
sensory, and EMG studies of Plaintiff's right arm in May 2001
reflect acute denervation consistent with a C5 root lesion on the
left (asymptomatic) side, and the remainder of the EMG was
normal; all nerve conduction studies were normal. (A.R. 197-99.)

The ALJ noted an inconsistency in Plaintiff's complaints.
The ALJ stated that in January 2004, Dr. Kneapler, a consulting
physician and AME (agreed medical examiner in a separate worker's
compensation proceeding), reported that Plaintiff's complaints
were intermittent, slight pain at rest and moderate pain with
heavy lifting or strenuous pushing or pulling. (A.R. 20.) The ALJ
noted that such limitations were contradicted by Plaintiff's
testimony that he could lift no more than ten pounds, but were
consistent with a capacity for light exertion. (A.R. 20.)

The record supports the ALJ's factual assertion. On April
27, 2004, Dr. Kneapler wrote that he re-evaluated Plaintiff on
January 28, 2004, and Plaintiff reported that he could not push
or pull strenuously or lift or carry anything heavy with either
arm; Dr. Kneapler recorded the subjective factors of disability
as intermittent slight pain at rest, increasing to intermittent,
moderate pain with heavy lifting or carrying or strenuous pushing
or pulling. (A.R. 434, 436.)

The inconsistency of Plaintiff's testimony with his
complaints to his doctors permitted an inference that Plaintiff's
testimony magnified or exaggerated his limitations.

The ALJ further stated that Plaintiff was able to drive a

1   shift stick (stick shift) car, which required use of the right
2   upper extremity. (A.R. 19.) Plaintiff did testify that at the
3   pertinent time, he drove a Fort Escort with a stick shift. (A.R.
4   19, 609.)

5       Plaintiff's testimony about being able to drive a stick
6   shift was inconsistent with his claim of limitations in the upper
7   extremities. The ALJ's reliance on not only the internal
8   inconsistency of Plaintiff's testimony, but also the
9   inconsistency of Plaintiff's activities of daily living with that
10  testimony, were appropriate. The Court concludes that the ALJ's
11  reasoning was clear and convincing in this regard.

12      The ALJ noted that in January 2003, Plaintiff refused to
13  continue his physical therapy, which contradicted his statement
14  of compliance with treatment. (A.R. 19.) The record reflects that
15  when asked if he was fully compliant with his treatment, i.e., if
16  he followed all his treatment recommendations, Plaintiff
17  testified that he did. (A.R. 615-16.) The ALJ's statement
18  concerning noncompliance is supported by the record, which
19  reflects that in January 2003, Plaintiff's physical therapist
20  noted that Plaintiff had missed four appointments in the previous
21  month and had cancelled the rest; Plaintiff had been beginning to
22  progress with physical therapy with decreased headaches, but he
23  discontinued therapy. (A.R. 153.)

24      At about the same time, Plaintiff's doctor opined that
25  pursuant to Plaintiff's report and the doctor's findings of
26  muscle spasm in the paracervical muscles and tenderness over the
27  area of the greater occipital nerve, therapy probably did
28  aggravate Plaintiff's upper back and cervical pain. (A.R. 152.)

1  Because of this, this specific aspect of the ALJ's reasoning does

2  not rise to the level of clear and convincing force. However,

3  this does not significantly detract from the overall soundness of

4  the ALJ's reasoning concerning Plaintiff's inadequate effort at

5  physical therapy. The ALJ separately noted that Plaintiff was

6  inconsistent in following his physical therapy prescription,

7  citing to the March 1998 progress report of a physical therapist

8  to the effect that Plaintiff had completed five sessions but had

9  six no-shows in the previous two months for a variety of reasons;

10 Plaintiff had been quite inconsistent with the physical therapy

11 prescription, and greater consistency and commitment was needed.

12 (A.R. 20, 268.) The Court notes that the record contains

13 additional substantial evidence supporting the finding that

14 Plaintiff was inconsistent in following his prescription. (A.R.

15 256 [consulting orthopedist noted that in early 1998, Plaintiff

16 was reluctant to perform exercises]; 241 [letter dated October

17 19, 1998 of consulting psychologist noting Plaintiff's trials at

18 physical therapy and Plaintiff's position that it did not help as

19 much as it hurt]; 237-38 [evaluation by physical therapist in

20 October 1998 in which it was stated that Plaintiff had stopped

21 physical therapy in Spring 1998 in anticipation of evaluation and

22 surgery, which had not occurred, and that he was subsequently

23 referred back to physical therapy].)

24      The ALJ noted that Plaintiff also testified that he

25 continued to smoke cigarettes and consume soft drinks with

26 caffeine, despite his physician's contrary advice and a past

27 possible diagnosis of caffeine intoxication, not to mention the

28 potential for exacerbation of his anxiety complaints. (A.R. 19,

615-16.)

The record supports the ALJ's reasoning. In October 1998, clinical psychologist Dr. Gareth C. Houghton examined Plaintiff, who reported that he smoked two and one-half packs of cigarettes and drank a twelve-pack of Pepsi Cola daily; Plaintiff complained of agitation much of the time, poor sleep, being easily distracted, panic attack symptomatology, and having difficulty concentrating. (A.R. 242-43.) Testing revealed that Plaintiff was a person who tended to be tense, worried, anxious, and agitated; the diagnostic impression was pain disorder affected by psychological factors and a general medical condition, and a major depressive disorder, with a need to rule out panic attacks versus caffeine intoxication. (A.R. 244.) The doctor stated that even if nothing else were going on with Plaintiff's life, Plaintiff's smoking and caffeine consumption alone would tend to make one extremely anxious and agitated; he recommended that Plaintiff should undergo a supervised physical rehabilitation program before undergoing surgery. (A.R. 245.) In October 2001, Plaintiff reported smoking a pack and one-half a day and drinking a six pack of soda pop a week. (A.R. 342.) In September 2004, Plaintiff's treating physician, Dr. Mylene M. Rucker, stated that Plaintiff was continuing to smoke and needed to stop. (A.R. 577.)

The Court concludes that Plaintiff's admissions that he continued to smoke and to consume excessive amounts of caffeinated beverages was inconsistent with his testimony that he was fully compliant with his treatment. In order to obtain benefits, a claimant must follow treatment prescribed by his or her physician if the treatment can restore the ability to work,

1  unless the person has an acceptable reason for failing to follow
2  the prescribed treatment. 20 C.F.R. § 404.1530. One factor that
3  an ALJ may consider in weighing a claimant's credibility is an
4  unexplained or inadequately explained failure to seek treatment
5  or follow a prescribed or directed course of treatment that can
6  improve the impairment to the extent that the person will not be
7  disabled and thus restore the ability to work. Orn v. Astrue, 495
8  F.3d 625, 636 (9th Cir. 2007). This reasoning is appropriate where
9  the symptom or phenomenon is such that a person's normal reaction
10 to it is to seek relief, and where modern medicine is often
11 successful in providing relief. Orn, 495 F.3d at 638.

12      Here, the record supports the ALJ's conclusion that
13 Plaintiff's mental impairments were at the least exacerbated by
14 his smoking and drinking of Pepsi, and that Plaintiff had not
15 explained his failure to follow the directed course of treatment.
16 In addition, the inconsistency of Plaintiff's testimony with his
17 behavior was a valid factor for the ALJ to consider. The Court
18 concludes that the ALJ's reasons were clear and convincing.

19      The ALJ further noted that Plaintiff's credibility was
20 further lessened by his poor work history, in which only six full
21 years of substantial gainful activity in the fifteen years before
22 the alleged onset. (A.R. 20.) A claimant's extremely poor work
23 history shows that he has little propensity to work and
24 negatively affects her credibility regarding her inability to
25 work. Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). The
26 ALJ's reasoning was clear and convincing and was supported by
27 substantial evidence. (A.R. 77.)

28      As to Plaintiff's claim that the ALJ failed to consider his

consistent efforts to obtain relief from his pain, the ALJ was presented with extensive medical evidence which the ALJ appropriately weighed and from which the ALJ drew permissible inferences. It is not necessary that an ALJ consider every possible factor relevant to credibility. Where the evidence supporting an ALJ's rejection of a claimant's credibility is substantial, and where it demonstrates that the ALJ did not arbitrarily reject the Plaintiff's testimony, the finding will be upheld even though the finding is not as extensive as possible and does not consider all possible factors. Crane v. Shalala, 76 F.3d 251, 254 (9th Cir. 1996) (where the AlJ's conclusion was based on the claimant's daily activities, treating therapist's notes, and good response to treatment); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1999) (upholding an ALJ's rejection of a claimant's credibility based on medical evidence, daily activities, and Plaintiff's testimony that a medication aided intermittent pain).

     In the present case, although there might have been factors supporting Plaintiff's credibility, and even though one factor relied upon by the ALJ was not supported by the record, the ALJ nevertheless articulated multiple clear and convincing reasons, supported by substantial evidence, for discrediting Plaintiff's subjective complaints of pain. Cf. Batson v. Commissioner of the Social Security Administration, 359 F.3d 1190, 1196 (9th Cir. 2004).

     V. Dr. Kneapler's Opinions

     Plaintiff argues that the ALJ erred in failing to adopt the opinion or opinions of the consulting, examining rheumatologist

Dr. David L. Kneapler, who functioned as an agreed medical examiner between or among the parties to the California Worker's Compensation proceeding, and not as a treating physician. (Pltf.'s Brief p. 9.)

The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The uncontradicted opinion of an examining physician may be rejected only if the Commissioner provides clear and convincing reasons for rejecting it. Id.; Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir. 2001). An ALJ may reject the opinion of an examining physician and adopt the contradictory opinion of a nonexamining physician only for specific and legitimate reasons that are supported by substantial evidence in the record. Moore v. Commissioner of Social Security Administration, 278 F.3d 920, 925 (9th Cir. 2002) (quoting Lester v. Chater, 81 F.3d at 830-31).

Dr. Kneapler rendered one opinion on April 27, 2004, to the effect that Plaintiff's disability by spine and torso guidelines under California's Worker's Compensation law precluded substantial work and prolonged positioning of his spine. (A.R. 436.)

Earlier, after his initial examination of Plaintiff on November 27, 2000, Dr. Kneapler opined in December 2000 that Plaintiff was permanently disabled from a work injury that required present treatment, and Plaintiff was not able to return to his usual job. (A.R. 468.)

In January 2001, Dr. Kneapler reported more fully on his agreed medical examination of November 2000, at which time

Plaintiff complained of pain in the neck radiating over the right shoulder, intermittent right finger and forearm pain, and muscle spasms and pain of the mid-back. (A.R. 445, 443-54.) Plaintiff "self-reported" inability to twist his neck or torso; push, pull, or reach well or lift or carry anything heavy with his dominant right upper extremity; markedly diminished grip strength; inability to sit or stand for more than an hour or walk for more than half an hour; and inability to look overhead. Dr. Kneapler diagnosed cervical spine injury with cervical radiculopathy, an MRI revealing neuroforaminal stenosis at C5-6 and C6-7 levels on the symptomatic side, acute pain behavior, reactivity, and increased pain tension cycle. He recommended epidural and selective nerve root injections with myelography with CT to outline lesions to determine if surgery could remedy them, pain management with or without surgery, and re-evaluation six months to a year after surgery if surgery were ordered. (A.R. 448-53, 443-54.)

In July 2002, Dr. Kneapler reported on his re-evaluation of Plaintiff on March 6, 2002, after Plaintiff's cervical spine surgery in August 2001, which Plaintiff reported brought him no substantial relief. Because Dr. Kneapler did not have complete records of Dr. Billys' surgery, he could not opine that Plaintiff was permanent and stationary. (A.R. 438-41, 438-39.)

On April 27, 2004, Dr. Kneapler reported on his re-evaluation of Plaintiff on January 28, 2004, at which time Plaintiff reported increased pain, headaches and nausea; he had been medicated for his headaches, and he could not push or pull strenuously or lift or carry anything heavy with either arm.

(A.R. 433-37.) Dr. Kneapler opined that as Dr. Billys had concluded on July 25, 2003, Plaintiff was permanent and stationary at that time. (A.R. 436.) Dr. Kneapler opined that based on Plaintiff's subjective complaints, and on objective factors of disability that included reduced cervical spine motion and weakness of the shoulder girdles from splinting from pain from his cervical spine injury, Plaintiff was precluded from substantial work pursuant to the spine and torso guidelines. (A.R. 436.) Further, he was precluded from prolonged positioning of his spine. (Id.)

With respect to the opinions of November 2000 and 2004, the ALJ stated:

> Little weight is given to Dr. Kneapler's November 2000 statement, on a Worker's Compensation fill-in-the-blanks, check-blocks form, that the claimant had permanent disability, or to his April 2004 report that the claimant was precluded from substantial work under State of California Worker's Compensation guidelines (Exhibit 4F, pp. 7, 39). Many of the notes on the form were illegible (Exhibit 4F, p. 39). Furthermore, it lacked bases for the conclusions regarding limitations, such as signs, test results, whether the limitations were based on claimant's subjective complaints or objective findings or observation, and it did not specify the claimant's residual functional capacity. Additionally, the determination of disability goes to the ultimate issue, which is reserved to the Commissioner (20 CFR 404.1527(e)).

> Nonetheless, I inquired about the signer's specialty(ies) and qualifications. I asked for explanation of specific limitations, onset date whereby the restrictions became effective, and bases for choosing that date, and if the condition existed less than 12 continuous months, whether it is expected to do so and at what severity level. Also, how often and approximate dates the doctor saw claimant, and if part of a treatment team, number and approximate dates that the form's signer consulted with other team members regarding claimant. Without this information I am not inclined to give Exhibits 4F, pp. 7 and 39 much weight. See, _Crane v. Shalala_, 76 F.3d 251, 253 (9th Cir. 1996) where the Court rejected

check-blocks forms that lacked bases. See also,
*Matney v. Sullivan*, 981 F.2d 1016, 1019-20 (9th Cir. 1992)
where it was held that an Administrative Law Judge
need not accept a treating physician's opinion if it
is conclusionary and brief, and unsupported by clinical
findings. Furthermore, the other substantial evidence
(discussed in this decision) does not fully support
the conclusions in Exhibits 4F, pp. 7 and 39. Even so,
because of the importance of these issues, I requested
clarification from the signer and I held the record open
through the date of this decision (Exhibit 10E). However,
nothing was ever received. For all of the foregoing
reasons, I have afforded little weight to Exhibits
4F, pp. 7 and 39.

(A.R. 18-19.)

The ALJ referred repeatedly to Exhibit 4F, and specifically to pages 7 (2004 opinion, A.R. 436) and 39 (December 2000 opinion, A.R. 468). Some of Plaintiff's argument appears to be based on an incorrect assumption about the identity of the precise opinion to which the ALJ's stated reasons pertained. For example, Plaintiff argues that the 2004 report is not on a form; however, it is clear that in referring to the opinion on the form, the ALJ was referring to Exhibit 4F p. 39 [A.R. 468], which was the 2000 opinion, and not to the 2004 opinion.

Most of Plaintiff's contentions relate to the 2004 opinion. It appears, however, that much of the ALJ's reasoning related to the 2000 opinion. This is understandable because the later opinion was rendered on April 27, 2004, and it related to a re-evaluation of Plaintiff performed on January 28, 2004. The examination thus occurred ten months <u>after</u> the last date of Plaintiff's insured status under DIB, which was March 31, 2003; and the 2004 opinion itself was rendered over a year after the March 2003 cutoff. It is established that the opinion of an expert who examines the claimant after the expiration of his

21

disability insured status, or the date last insured (DLI), is
generally entitled to less weight than the opinion of one who
completed a contemporaneous exam. Macri v. Chater, 93 F.3d 540,
545 (9th Cir. 1996).

A reading of the entire decision of the ALJ reflects a clear
focus on the medical records during the pertinent time, and a
consistent devaluation of records or matters pertaining to the
time period after the DLI. The ALJ expressly stated the date
Plaintiff was last insured (DLI) and noted that the impairments
had to be shown to be disabling on or before that date. (A.R.
15.) The ALJ referred to reports throughout the entire period
before the hearing, and particularly with respect to credibility
issues, but he repeatedly confirmed the importance of the timing
in his evaluation. (A.R. 15 [severity findings were expressly
made "during the relevant period"; diabetes treatment records
from a post-DLI period were "all after claimant's date last
insured" and thus the condition "had only minimal, if any, effect
on his ability to work" and was therefore non-severe "during the
relevant period"; the April 2004 diagnosis of mild degenerative
changes in both knees "was made after the DLI," and thus the
impairment was non-severe]; A.R. 20 [third party function report
completed by Plaintiff's wife in May 2004 was in part given
"limited weight since it was completed after March 2003"].)

The Court thus understands the ALJ to have stated clearly a
general reliance on only timely opinions and data, and an
intention to put less weight on matters that came to pass after
the DLI. Fairly read, this assessment applies to the 2004
opinion, and this reasoning was supported by substantial evidence

1  in the record and was specific and legitimate.

2      The ALJ stated other specific, legitimate reasons, supported
3  by substantial evidence in the record, for putting less weight on
4  the opinions of the consulting examiner.

5      With respect to the 2000 opinion, the record supports the
6  ALJ's conclusion that the opinion was stated on a form and lacked
7  any explanation of the precise bases for the extreme functional
8  limitations imposed. The form consisted of boxes, empty or
9  checked off, and blanks with brief, largely illegible notations.
10 (A.R. 468.) The form did contain checks for boxes indicating that
11 there were subjective complaints, abnormal physical or
12 psychological findings, and relevant diagnostic tests results,
13 but it left the reader to guess at the contents of the questions
14 and/or answers and the identity of any of the findings or tests.
15 (A.R. 468.) Further, as of the date of the 2000 opinion (December
16 7 or 8 (illegible), 2000), Dr. Kneapler had not memorialized his
17 findings or interpretation of the chronology of Plaintiff's
18 condition in any form reflected in the record presently before
19 the Court. Substantial evidence supports the ALJ's
20 characterization of the opinion.

21     The ALJ also reasoned that the opinion simply went to the
22 ultimate issue without specifying any residual functional
23 capacity (RFC). This reasoning reflects application of correct
24 legal standards, was supported by substantial evidence, and was
25 specific and legitimate. In determining a claimant's RFC, an ALJ
26 needs to assess whether or not a claimant has specific functional
27 limitations. Social Security regulations define residual
28 functional capacity as the "maximum degree to which the

1  individual retains the capacity for sustained performance of the

2  physical-mental requirements of jobs." <u>Reddick v. Chater</u>, 157

3  F.3d 715, 724 (9th Cir. 1998) (citing 20 C.F.R. 404, Subpt. P,

4  App. 2 § 200.00(c) and <u>Lester v. Chater</u>, 81 F.3d 821, 833 (9th

5  Cir. 1995)). The Commissioner must evaluate the claimant's

6  "ability to work on a sustained basis." <u>Id.</u> (citing 20 C.F.R. §

7  404.1512(a)); <u>Lester</u>, 81 F.3d at 833); <u>see</u> 20 C.F.R. §

8  404.1545(b). A "regular and continuing basis" means eight hours a

9  day, five days a week, or an equivalent work schedule. S.S.R. 96-

10  8p at 1, 2. The process involves an assessment of physical

11  abilities and then of the nature and extent of physical

12  limitations with respect to the ability to engage in work

13  activity on a regular and continuing basis. 20 C.F.R. §

14  404.1545(b). 20 C.F.R. § 404.1545(b).

15      Here, the absence of specific functional limitations was a

16  legitimate basis for the ALJ to rely on in assigning less weight

17  to the opinion because the doctor's statement was substantially

18  less useful to the ALJ than it would have been had it set forth

19  specific functional limitations with specific bases for each such

20  limitation. Further, it is established that a determination of

21  whether or not a claimant meets the statutory definition of

22  disability is a legal conclusion reserved to the Commissioner;

23  the opinion of a medical source on the ultimate issue of

24  disability is not conclusive. 20 C.F.R. §§ 404.1527(e)(1),

25  416.927(e)(1); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir.

26  1989). Finally, it is permissible for an ALJ to prefer an opinion

27  supported by specific clinical findings and an explanation

28  thereof over a check-off type of form lacking an explanation of

1  the basis for the conclusions. <u>Crane v. Shalala</u>, 76 F.3d 251, 253

2  (9th Cir. 1996) (citing <u>Murray v. Heckler</u>, 722 F.2d 499, 501 (9th

3  Cir. 1983)); <u>see</u> <u>Batson v. Commissioner of the Social Security</u>

4  <u>Administration</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).

5      Plaintiff points to the status of Dr. Kneapler as an agreed

6  medical examiner, and his opinion concerning Plaintiff's

7  disability based on California standards. However, as Defendant

8  notes, the Commissioner was not a party to that decision and thus

9  did not grant any particular authority to Dr. Kneapler with

10 respect to expert assessment of Plaintiff's impairments. The

11 doctor's opinion that Plaintiff was disabled under California law

12 is an administrative, not a medical, finding that is reserved to

13 the Commissioner and is not entitled to any special significance.

14 20 C.F.R. §§ 404.1527(e)(3); 416.927(e)(3).

15     More fundamentally, such a notion is inconsistent with the

16 established principle that even a <u>decision</u> by a non-governmental

17 agency or any other governmental agency about whether one is or

18 was disabled is based on its rules and does not become the

19 decision of the SSA about whether one was or is disabled; the SSA

20 must make a disability determination based on Social Security

21 law, and thus opinions concerning degrees of disability, partial

22 disability, spine and torso guidelines, and other concepts

23 peculiar to California's law of worker's compensation are not

24 conclusive in a Social Security case. 20 C.F.R. §§ 404.1504,

25 416.904; <u>Macri v. Chater</u>, 93 F.3d 540, 543-44 (9th Cir. 1996). A

26 mere opinion of an expert participating in another governmental

27 agency's disability system is likewise not conclusive. The SSA

28 ALJ retains authority unfettered by California's system to draw

25

inferences logically flowing from the evidence. Macri v. Chater,
93 F.3d at 543-44.

Here, Dr. Kneapler's 2004 opinion was stated in terms of
California's legal standards and lacked specification of
functional limitations and an explanation of the specific medical
findings on which such limitations were based.

Plaintiff argues that the record shows that Dr. Kneapler's
opinion was clearly supported by extensive clinical findings.
There were clinical results that may not have necessarily been
inconsistent with an opinion of disability, such as x-ray and MRI
results that reflected degenerative changes in Plaintiff's
cervical spine from both before the DLI, and thereafter. (A.R.
265-66, 282 [MRI of March 1998 revealing mild posterolateral
herniation of the C5-6 disc on the right side extending into the
region of the right intervertebral foramen, which was narrowed
due to the bulge and associated spurring, and a small
posterolateral herniation of the C6-7 intervertebral disc on the
right side, causing narrowing of the right intervertebral foramen
with some hypertrophic spurring; and 1997 x-ray showing mild
scoliosis of the thoracic spine with multiple levels of
degenerative disc disease]); A.R. 589 [March 2006 x-rays of the
cervical spine reflecting post-operative changes consistent with
diskectomy and fusion at the C6-7 level with posterolateral
osteophytic spurring of the vertebral end plates causing severe
encroachment upon the right neural foramen and mild encroachment
upon the left neural foramen; moderate degenerative narrowing of
the C5-6 disc interspace and osteophytic spurring causing mild
encroachment upon the bilateral neural foramina; and mild

degenerative narrowing of C4-5 disc interspace with mild
osteophytic spurring and mild encroachment on the bilateral
neural foramina].)

However, as Defendant notes, the mere existence of an
impairment is insufficient proof of disability. <u>Matthews v.
Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993). Dr. Kneapler's 2004
opinion contained objective findings, and it was clear that the
doctor found significant the reduced cervical spine motion and
weakness of the shoulder girdles from splinting from pain from
the cervical spine injury.(A.R. 436.) However, the doctor did not
explain how those relatively mild objective factors resulted in a
preclusion from work. (A.R. 436.)

The ALJ inquired about, and left the record open for
submissions concerning, Dr. Kneapler's qualifications,
explanation of specific limitations, onset date of restrictions,
bases for choosing the date, and duration of the condition. (A.R.
18-19.) This was reasonable considering the opinion's lack of any
precise functional limitations or explanation for the extent of
the restrictions imposed. However, Dr. Kneapler did not respond.
Plaintiff contends this was meaningless because Dr. Kneapler was
not promised payment for his services, but there is nothing in
the record before us that demonstrates any circumstances that
would render this effort by the ALJ to obtain additional
information futile or insignificant. Dr. Kneapler had obviously
spent a great deal of time on Plaintiff's case and had ample
basis to respond to the ALJ's focused questions.

Plaintiff argues that information regarding Dr. Kneapler's
specialties (board certification in internal medicine,

1   rheumatology, and pain medicine) was available from his
2   letterhead, and his reports reflected that he acted as an
3   examining consultant in the role of agreed medical examiner.
4   Nevertheless, the ALJ validly sought information regarding
5   specific functional limitations and the basis and explanation for
6   any conclusions. Further, the ALJ proceeded fairly and
7   reasonably. It has been held that even where an ALJ has a duty to
8   attempt to re-contact a physician for additional information, he
9   performs his duty in articulating the precise information needed
10  and leaving the record open for a reasonable time period for
11  supplementation. Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir.
12  1999); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)
13  (noting regulations providing that an appropriate inquiry could
14  include subpoenaing the physicians, submitting further questions
15  to them, or continuing the hearing to augment the record). It was
16  appropriate for the ALJ to proceed to determine Plaintiff's claim
17  based on the medical record after Plaintiff failed to respond to
18  the ALJ's request. 20 C.F.R. § 404.1516.

19       Plaintiff argues that the fact that the physician did not
20  respond is no reason for the ALJ to devalue the physician's
21  opinion. However, a fair reading of the decision of the ALJ
22  reveals that he devalued the opinion because of its omissions and
23  not simply because the physician did not respond. It was
24  Plaintiff's burden to prove that he was disabled, i.e., that he
25  was precluded from engaging in not only his previous work, but
26  also from performing any other kind of substantial gainful work
27  due to the impairment. Matthews v. Shalala, 10 F.3d 678, 680
28  (citing 42 U.S.C. § 423(d)(1)(A)). Further, Plaintiff must

1 establish that an impairment has lasted or is expected to last at
2 least twelve continuous months, and the inability to work caused
3 by the impairment must last at least twelve continuous months. 20
4 C.F.R. §§ 404.1509, 416.909; Barnhart v. Walton, 535 U.S. 212,
5 214-22 (2002). Plaintiff did not meet his burden in this regard.

6      The ALJ reasoned that substantial evidence in the record did
7 not support Dr. Kneapler's opinion. (A.R. 18-19.) Plaintiff does
8 not specifically challenge this reasoning. The Court notes that
9 the ALJ summarized the medical evidence of record during the
10 pertinent time. (A.R. 15-18.) The ALJ assigned substantial weight
11 to the opinion of treating physician Dr. Billys in December 1999
12 that Plaintiff could lift and carry no more than twenty to
13 twenty-five pounds without repetitive bending and lifting, and
14 thus Plaintiff could perform his past relevant work as a
15 phlebotomist. (A.R. 16, 18, 210-11.) Dr. Billys noted intact
16 sensation, motor strength of +5/5 in all muscle groups, full
17 range of motion of the shoulders, elbows, wrists, and fingers,
18 tenderness over the parascapular muscles and over the
19 thoracolumbar junction; radiographs showed degenerative changes
20 in the cervical spine and some small disc herniations without
21 lateralization or foraminal stenosis. (A.R. 210.) The diagnosis
22 was cervical spondylosis, C5-6, C6-7; thoracic and lumbar
23 spondylosis; and history of anxiety and depression. (Id.)

24      The ALJ also credited the opinion of the state agency
25 medical consultants in June and August 2004 that with respect to
26 the period ending in March 2003, Plaintiff could perform light
27 exertion with limited ability to perform overhead work because of
28 neck pain. (A.R. 18, 539-49.) The ALJ's reasoning was that these

opinions were supported by objective evidence showing that
Plaintiff had limited range of neck movement before and after the
cervical fusion, which would limit his ability to perform
overhead work, but had mild or no limitations in his lower back
and legs; even before surgery, Plaintiff had adequate upper
extremity strength for light exertion. The EMG and nerve
conduction studies showed the absence of severe radiculopathy in
the claimant's arms, and examination findings showed adequate
handgrip strength. (A.R. 18.)

Substantial evidence supports the ALJ's reasoning. The
record contains nerve conduction studies from January 1999 of
Plaintiff's median, ulnar, and radial nerves, which revealed
essentially normal results with some evidence of mild entrapment
of the median nerves at the wrist that was clinically
insignificant. (A.R. 221.) Further, orthopedist Dr. Arthur
Holmboe examined Plaintiff in June 1998 and found normal flexion
and extension, normal rotation to the right and left, full and
normal lateral bending, normal range of motion of the shoulders,
elbows, and wrists, normal and painless hyperextension, normal
lumbar lordotic curve reversal, and normal rotation maneuvers.
(A.R. 257-58.) Further, there was no evidence of weakness in
either lower extremity; range of motion of the hips, knees, and
ankles was normal and equal bilaterally; motor examination of the
ankles was normal, and there was no evidence of weakness of the
tibialis anticus and extensor hallucis longus; Patrick's test of
flexion, abduction, and external rotation of the hip were normal
bilaterally; and there was no evidence of fasciculation or
atrophy in either lower extremity. (A.R. 257-58.) Dr. Holmboe

recommended additional studies, including neurodiagnostic studies, to pinpoint whether Plaintiff had neuropathy and any ulnar component. (A.R. 260.) Dr. Kneapler's findings in January 2004 included only moderate weakness of the shoulder girdles form cervical spine pain, mild atrophy and weakness of the right abductor digiti quinti, mildly weak finger flexors of the right hand, and moderately weak right triceps; grip strength was 47/68, 55/57, and 59/64 with variable effort, with normal at 90/82, and estimated strength 50/82. Further, the cervical spine exam showed extension 20, flexion 25, right lateral rotation 20, left lateral rotation 30, right lateral bending 50, and left lateral bending 30 per cent of normal with motion moderately painful. There was normal thoracic spine but only mildly restricted motion of the lumbosacral spine. (A.R. 435.)

It is established that a valid basis for putting less weight on an expert opinion is that it is inconsistent with record as a whole. 20 C.F.R. § 404.1527(d)(3)-(6); <u>Orn v. Astrue</u>, 495 F.3d 625, 631 (9th Cir. 2007).

In summary, the Court concludes that the ALJ gave specific and legitimate reasons for rejecting the opinion of consulting examiner Dr. Knaepler, and that those reasons were supported by substantial evidence in the record.

VI. <u>Disposition</u>

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision

1  of the Defendant Commissioner of Social Security and DENIES

2  Plaintiff's Social Security complaint.

3        The Clerk of the Court IS DIRECTED to enter judgment for

4  Defendant Michael J. Astrue, Commissioner of Social Security,

5  and against Plaintiff Dennis D. Mitchell.

6

7  IT IS SO ORDERED.

8  **Dated:    February 15, 2008**                    **/s/ Sandra M. Snyder**
                                         UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28